# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **CARL WARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:19-cv-00484** |
| **NPAS, INC.,** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Before the court is defendant NPAS, Inc.'s Motion for Summary Judgment (Doc. No. 47), seeking judgment in its favor on plaintiff Carl Ward's claims under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.* As set forth herein, the material facts are undisputed, and the defendant's motion presents a single legal issue for resolution: whether, based on the undisputed facts, the defendant qualifies as a "debt collector," as defined by the FDCPA. As set forth herein, the court finds that it does not. Its motion, therefore, will be granted.

## I.    UNDISPUTED FACTS[1]

On or about July 15 or 16, 2018, plaintiff Carl Ward received medical treatment at Stonecrest Medical Center ("Stonecrest"). As a condition of treatment, Ward executed a Conditions of Admission and Consent to Outpatient Care agreement ("Conditions of Admission agreement"), dated 7/16/2018. The Conditions of Admission agreement identifies the account number associated with the services provided in connection with that agreement as 511667555.

---

[1] The facts set forth herein are drawn from the plaintiff's Response to the Defendant's Statement of Undisputed Material Facts ("SUMF") (Doc. No. 51-3), unless otherwise indicated, and are undisputed for purposes of the defendant's Motion for Summary Judgment.

(Doc. No. 49-2, at 1.) The agreement expressly states (in relevant part) as follows with respect to

Ward's financial obligation:

> **Financial Agreement.** In consideration of the services to be rendered to Patient, Patient . . . individually promises to pay the Patient's account . . . . I also understand that, as a courtesy to me, the hospital may bill an insurance company offering coverage . . . . Regardless, I agree that, except where prohibited by law, the financial responsibility for the services rendered belongs to me, the Patient . . . . I agree to pay for services that are not covered and covered charges not paid in full by insurance coverage including, but not limited to, coinsurance [and] deductible. . . .

(Doc. No. 49-2, at 2–3.)

The Conditions of Admission agreement expressly states (in relevant part) as follows with

respect to the involvement of third parties to service Ward's account:

> **Third Party Collection.** I acknowledge that the Providers may utilize the services of a third party Business Associate or affiliated entity as an extended business office ("EBO Servicer") for medical account billing and servicing. During the time that the medical account is being serviced by the EBO Servicer, the account shall not be considered delinquent, past due or in default, and shall not be reported to a credit bureau or subject to collection legal proceedings. When the EBO Servicer's efforts to obtain payment have been exhausted due to a number of factors . . . , the EBO Servicer will send a final notice letter which will include the date that the medical account may be returned from the EBO Servicer to the Provider. Upon return [of the medical account] to the Provider by the EBO Servicer, the Provider may place the account back with the EBO Servicer, or, at the option of the Provider, may determine the account to be delinquent, past due, and in default. Once the medical account is determined to be delinquent it may be subject to late fees, interest as stated, referral to a collection agency for collection as a delinquent account, credit bureau reporting and enforcement by legal proceedings.

(Doc. No. 49-2, at 3 (emphasis added).)

In signing the Conditions of Admission agreement, the plaintiff expressly consented to

telephone calls from Stonecrest or an EBO Servicer related to her financial obligations:

> **Consent to Telephone Calls for Financial Communications**. I agree that, in order for you [Stonecrest], or your EBO Servicers and collection agents, to service my account or to collect any amounts I may owe, I expressly agree and consent that you or your EBO Servicer and collection agents may contact me by telephone at any telephone number I have provided or you or your EBO Servicer and collection agents have obtained or, at any number forwarded or transferred from that number,

regarding the hospitalization, the services rendered, or my related financial obligations. Methods of contact may include using pre-recorded/artificial voice messages and/or use of an automatic dialing device, as applicable.

(Doc. No. 49-2, at 5.)

Ward specifically acknowledged by initialing and signing the Conditions of Admission agreement that (1) she was given the opportunity to read and ask questions about the information contained in the Conditions of Admission agreement; (2) she either had no questions or her questions had been answered to her satisfaction; and (3) she signed the Conditions of Admission agreement freely and without inducement, other than the rendition of services by the Providers. Ward also certified that she had read and fully understood the Conditions of Admission agreement.

Defendant NPAS, Inc. ("NPAS") serves as an EBO Servicer for Stonecrest.[2] NPAS does not receive payments in its own name; it directs the individuals it contacts to make payments directly to its clients, including Stonecrest. A written policy titled "General Collection Process" (Doc. No. 49-3), effective date 01/25/2016, controls and describes the billing workflow process for accounts such as the plaintiff's. Pursuant to this policy, Stonecrest initiates the billing process after services are rendered to a patient. After sending the initial bill, Stonecrest may continue to work the account in-house or assign it to NPAS. If it is assigned to NPAS, NPAS will attempt to collect on the patient account through collection calls or letters. If it is unsuccessful in making contact, securing payment in full, or establishing a payment plan, NPAS "sends the patient a final notice." (Doc. No. 49-3, at 5.) If the patient makes no payment after receipt of the final notice, "the account is closed and sent to a primary outside collection agency." (*Id.*) Accounts are placed with

---

[2] The plaintiff does not dispute that NPAS and Stonecrest characterize NPAS as an EBO Servicer or that NPAS "sometimes services in that capacity." (Doc. No. 51-3, Resp. to SUMF ¶ 8.) The plaintiff contends, however, that the question of whether NPAS functioned as an EBO Servicer in this case is "a disputed legal contention rather than an undisputed fact." (*Id.*)

a primary collection agency (*i.e.*, a debt collector for defaulted accounts) on average 173 days after a patient is discharged. (Doc. No. 49-3, Wright Decl. ¶ 16.)

On or about October 3, 2018, approximately eighty days after Ward's discharge date, Stonecrest placed Ward's Account No. 511667555 with NPAS. On the same date, NPAS sent its first billing statement to Ward on behalf of Stonecrest. The statement shows NPAS's full name ("NPAS, Inc.") and mailing address in the top left corner, in large letters, and, in the top right corner, it indicates that the bill is for "Services provided by: TriStar Stonecrest Medical Center." (Doc. No. 49-4, at 1.) The statement identifies the "Patient Name" and "Responsible Party" as Carl Ward and sets forth the account number (511667555), the service dates of 07/15/2018 – 07/16/2018, and a "Statement Date" and "Placement Date" of 10/03/2018. The statement also includes a section labeled "PAYMENT REQUEST" that reflects total payments on Account No. 511667555 in the amount of $2,082.00, a current balance of $80.00, a "Payment Due By" date of 10/18/18, and an "Amount You Owe" of $80.00. The same section also includes the following information:

> The insurance company was billed, leaving an unpaid balance in the amount shown above. Our records indicate that the balance is your responsibility. Please send payment at this time. If paying by check or money order, please indicate the account number and make payable to Stonecrest Medical Center. In the event you are unable to pay the balance in full, please contact us at 1-800-223-9899.

(Doc. No. 49-4, at 1.)

The second page of the October 3, 2018 billing statement includes a section titled "FREQUENTLY ASKED QUESTIONS." The first question in this section is "Who is NPAS, Inc.?" The answer provided is "NPAS, Inc. is a company that is managing your account for the healthcare provider." (*Id.* at 2.)

Ward did not submit payment, and NPAS sent a second statement to her dated November 17, 2018. (Doc. No. 49-5.) The second statement once again identifies Ward as the patient and responsible party and sets forth her account number, service dates of 07/15/18 – 07/16/18, and "Placement Date" of 10/03/2018. Where the first statement includes a section labeled "PAYMENT REQUEST," the second statement includes, instead, a section labeled "ATTENTION REQUIRED," highlighted in pink. This section again reflects total payments of $2,082.00, a current balance of $80.00, an "Amount You Owe" of $80.00, and a new "Payment Due By" date of 11/27/18. (*Id.*) The section includes the following language:

> You are obligated to pay for the services provided and we strongly urge you to take advantage of this FINAL opportunity to settle your balance. If payment in full is not received, your account may be referred to a debt collector without further notice. If you are unable to pay this account in full, please contact us at 1-800-223-9899 to discuss resolving your account balance. If you have already sent payment in full or contacted us to resolve the balance, thank you.

(*Id.*)

The second page of the second statement includes the same "FREQUENTLY ASKED QUESTIONS" section, identifying NPAS, Inc. as "a company that is managing your account for the healthcare provider." (*Id.* at 2.)

On October 24, 2018 and again on December 27, 2018, NPAS left a voicemail message for Ward that stated:

> We are calling from NPAS on behalf of Stone Crest Medical Center. Please return our call at 1-800-223-9899, Monday through Friday between 8:30 A.M. and 9:30 P.M. Eastern Standard Time and Saturday between 9:00 A.M. and 1:00 PM. Eastern Standard Time. Thank you. Hello, we are calling from NPAS on behalf of Stone Crest Medical Center. Please return our call at 1-800-223-9899, Monday through Friday between 8:30 A.M. and 9:30 P.M. Eastern Standard Time and Saturday between 9:00 A.M. and 1:00 PM. Eastern Standard Time. Thank you.

(Doc. No. 49-3 ¶ 9.)

On approximately January 1, 2019, Account No. 511667555 was closed and returned to Stonecrest; this occurred 90 days after placement of the account with NPAS and 170 days after the provision of medical services to the plaintiff.

Meanwhile, Carl Ward had received medical treatment a second time at Stonecrest, from October 23–24, 2018. As a condition to being treated at Stonecrest, Ward again executed the Conditions of Admission agreement, this one referencing Account No. 511917962. (Doc. No. 49-6.) The language of this Conditions of Admission agreement is identical to that of the Conditions of Admission agreement that Ward signed on July 16, 2018. Ward again acknowledged that she was given the opportunity to read and ask questions about the information contained in the Conditions of Admission agreement, had no questions, and signed the agreement freely and without inducement other than the rendition of medical services. She again certified that she had read and fully understood the agreement.

On or about December 22, 2018, approximately sixty days after Ward's receipt of the additional medical services, Stonecrest placed her Account No. 511917962 with NPAS. On or about the same date, NPAS sent Ward its first statement relating to Account No. 511917962. (Doc. No. 46- 7.) The format of this billing statement is identical to that of the October 3, 2018 statement, and the information provided on it is nearly identical, including that it shows a current balance of $80.00. The only differences between this billing statement and the first billing statement NPAS sent to Ward are in the account number (511917962), dates of service (10/23/2018 – 10/24/2018), Statement and Placement Dates (both 12/22/2018), and "Payment Due By" date (01/06/19).

On or about February 4, 2019, NPAS sent a second statement to Ward relating to Account No. 511917962. (Doc. No. 46-8.) This statement is identical in format to the second statement sent on Account No. 511667555 on November 17, 2018, and the information on it likewise differs only

with respect to the account number, services dates, Statement and Placement Dates, and "Payment Due By" date (extended on this statement to 02/14/2019).

On March 14, 2019, NPAS left a voicemail message with Ward that was identical to those left on October 24 and December 27, 2018.

On approximately March 22, 2019, Account No. 511917962 was closed and returned to Stonecrest, 90 days after its placement with NPAS and 150 days after the plaintiff's discharge from Stonecrest.

## II. PROCEDURAL HISTORY

Ward filed the Complaint initiating this lawsuit on June 5, 2019, asserting a claim under the FDCPA and incorrectly identifying National Patient Account Services Solutions, Inc. as the sole defendant. (Doc. No. 1.) Pursuant to a joint Stipulation (Doc. No. 14), the parties agreed that NPAS, Inc. should be substituted as the correct defendant and that the plaintiff should be permitted to file an Amended Complaint to effect that substitution. The First Amended Complaint (Doc. No. 15), was filed on July 30, 2019 and asserts a claim against NPAS for violation of the FDCPA. Specifically, the plaintiff alleges that she is a "consumer" as defined by 15 U.S.C. § 1692a(3); NPAS is a "debt collector" as defined by § 1692a(6); and the subject debts are "debts" as defined by § 1692a(5). Ward asserts that NPAS (1) violated § 1692d(6) by failing to make a meaningful disclosure of its identity when it placed telephone calls to her; (2) violated § 1692e(11) by failing to include notice in its communications with her that it was attempting to collect a debt and that all information obtained would be used for that purpose; and (3) violated § 1692e(14) by failing to use its full "true name" in its voicemail messages, where it identified itself as "NPAS" rather than as "NPAS, Inc." (Doc. No. 15 ¶ 28.) The plaintiff seeks actual and statutory damages arising from these violations, plus costs and attorney's fees.

Following entry of a case management order and a period of discovery, NPAS filed its Motion for Summary Judgment, accompanied by a supporting Brief, Statement of Undisputed Material Facts, the Declaration of Don Wright, and several exhibits, including the complete transcript of the plaintiff's deposition and the documents referenced in NPAS's Statement of Undisputed Material Facts. (Doc. Nos. 47–49 and attached exhibits.) The plaintiff filed her Response, Response to the Statement of Undisputed Material Facts, and a single exhibit—a copy of the defendant's Response to Requests for Admissions ("RFAs"). (Doc. No. 51 and exhibits.)

The plaintiff did not file her own dispositive motion by the deadline for doing so, but, shortly after having responded to the defendant's motion, she filed a Motion for *Sua Sponte* Grant of Summary Judgment in Plaintiff's Favor Based Upon Plaintiff's Memorandum in Opposition to NPAS, Inc.'s Motion for Summary Judgment. (Doc. No. 53.) The defendant opposes this motion (Doc. No. 57) and also filed a Reply in further support of its own motion (Doc. No. 58).

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Trans. Co.*, 446 F.3d 637, 640 (6th Cir. 2006). A genuine dispute of material fact exists if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will not be insufficient to allow that party's claims to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## IV.    DISCUSSION

As indicated above, the sole issue in dispute is whether the defendant qualifies a "debt collector" as defined by the FDCPA. This is a question of law appropriate for resolution on summary judgment. *See Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 403 (3d Cir. 2000) (deciding that defendants were debt collectors for purposes of a motion for summary judgment); *Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 387–88 (7th Cir. 1998) (deciding that defendants were not debt collectors for purposes of a motion for summary judgment); *Wadlington*

*v. Credit Acceptance Corp.*, 76 F.3d 103, 106–07 (6th Cir. 1996) (deciding that the defendants were not debt collectors for purposes of a motion for summary judgment). NPAS argues here that it does not qualify as a "debt collector" because the debts in question were not in default at the time of its communications with the plaintiff.

### A.     The Legal Landscape

To prevail on a claim under the FDCPA, a plaintiff must show that "(1) [she] is a 'consumer' as defined by the FDCPA, (2) the 'debt' arose 'out of transactions which are "primarily for personal, family or household purposes[,]"' (3) the defendant is a 'debt collector' as defined by the FDCPA, and (4) the defendant violated the prohibitions set forth in § 1692e." *Bauman v. Bank of Am., N.A.*, 808 F.3d 1097, 1100 (6th Cir. 2015) (quoting *Wallace v. Washington Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012)).

Thus, "[a]s a matter of law, liability under §§ 1692d and 1692e can only attach to those who meet the statutory definition of a 'debt collector.'" *Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003). The term "debt collector" is defined by the FDCPA as

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . .

15 U.S.C. § 1692a(6). However, expressly excluded from this definition is "any person collecting or attempting to collect any debt . . . *which was not in default at the time it was obtained by such person*." 15 U.S.C. § 1692a(6)(F)(iii). In other words, even assuming that the defendant meets every other element of the definition of a debt collector, no liability can be incurred if the debt in question was not "in default" at the time the defendant "obtained" it. *See Montgomery*, 346 F.3d at 699 ("Huntington Bank also does not qualify as a debt collector because it falls within the provision of § 1692a(6)(F)(iii), a 'person collecting or attempting to collect any debt owed or due

. . . to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person.'"). "Thus, under § 1692a(6)(F)(iii), the classification of debt collector depends upon the status of a debt, rather than the type of collection activities used." *Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003); *see also Henson v. Santander Consumer USA, Inc.*, 817 F.3d 131, 136 (4th Cir. 2016) ("[A] person collecting nondefaulted debts on behalf of others is not a debt collector."), *aff'd*, 137 S. Ct. 1718 (2017).

Given the critical importance of the term "in default," it would be logical to presume that Congress would have defined it in the statute. Logic notwithstanding, Congress has never defined the term, leaving that task to the courts.[3] The Supreme Court has not addressed the issue, nor has the Sixth Circuit had the opportunity to weigh in, other than to state that the definition of a debt "in default" includes one that is "treated . . . as if it were in default at the time of acquisition." *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012).

In attempting to define the term, courts have almost universally rejected a definition that would mean a debt is "in default immediately after it first becomes due," recognizing that "this approach is at odds with how the term is generally understood." *Alibrandi*, 333 F.3d at 86; *see id.* ("In applying the FDCPA, courts have repeatedly distinguished between a debt that is in default and a debt that is merely outstanding, emphasizing that only after some period of time does an outstanding debt go into default. . . ."); *accord Wagoner v. NPAS, Inc.*, No. 3:18-CV-520 DRL-MGG, 2020 WL 1987528, at *5 (N.D. Ind. Apr. 27, 2020) ("By its plain language, the FDCPA

---

[3] Almost twenty years ago, the Federal Trade Commission ("FTC") "formally recommended that Congress amend § 1692a(6)(F)(iii) 'so that its applicability will depend upon the nature of the overall business conducted by the party to be exempted rather than the status of individual obligations when the party obtained them.'" *Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003) (quoting FTC Annual Report: FDCPA, http://www.ftc.gov/os/2001/03/fdcpaar2000.htm (Mar. 2001)). To date, Congress has not acted on that recommendation.

had more in mind than just a ripe debt when it described a debt 'in default.' In this statute, a debt in default cannot then mean merely the money owed or the obligation to pay financial commitments alone. The words walking hand-in-hand with 'default' in this exception winnow the optional definitions to the failure to pay a debt when due in reference to a legal or contractual duty. A debt will not go into default until after it has become owed and due.").

The Second Circuit also recognized that considering a debt to be "in default" immediately after it becomes due would have "the paradoxical effect of immediately exposing debtors to the sort of adverse measures, such as acceleration, repossession, increased interest rates, and negative reports to credit bureaus, from which the [FDCPA] intended to afford debtors a measure of protection," and, therefore, that it would be "ill-advised to adopt an approach that precipitously visits these consequences upon debtors." *Id.* at 87. Instead, the Second Circuit suggested that, at least until Congress itself defined the term, "the interests of debtors, creditors, collectors, and debt service providers will best be served by affording creditors and debtors considerable leeway contractually to define their own periods of default, according to their respective circumstances and business interests." *Id.* at 87 n.5.

Other courts have similarly concluded that,

> where a contract between the originating creditor and the consumer delineates when the account will be deemed defaulted, or where some other applicable statute or regulation fixes the precise moment of default, courts have generally held that such agreements or legal provisions dictate when an account is "in default" for FDCPA purposes.

*Church v. Accretive Health, Inc.*, No. CV 14-0057-WS-B, 2015 WL 7572338, at *8 (S.D. Ala. Nov. 24, 2015), *aff'd*, 654 F. App'x 990 (11th Cir. 2016); *see also De Dios v. Int'l Realty & Invs.*, 641 F.3d 1071, 1074 (9th Cir. 2011) ('Although the [FDCPA] does not define 'in default,' courts interpreting § 1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the

debt at issue."). This approach is not universally accepted. In fact, courts have taken a wide variety of roads to reach a definition of the term. *See Wagoner*, 2020 WL 1987528, at *4–5 (noting that "courts across the country have interpreted the meaning of 'default,' with less than uniformity" and surveying the wide variety of approaches).

In *Wagoner*, after a lengthy analysis, the court concluded that the most logical course was to apply the plain meaning of "default" ("omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due," *id.* at *7 (quoting Black's Law Dictionary (11th ed. 2019)), but with due deference to the terms of any applicable contract and consideration of any "other relevant circumstances," *id.* The court noted that there was "little reason . . . to be so wary of contract terms when there isn't evidence that practices were instituted to evade the FDCPA" and that, "[a]fter all, to determine whether a person has failed to pay a debt when due, one must look to the contract (or relevant statute) to make that determination. . . . The definition of 'default' contemplates this very thing." *Id.* In sum, the court in *Wagoner* concluded:

> Consistent with its broad remedial purpose, the FDCPA builds in flexibility on when a specific debt will prove in default for the host of circumstances it was meant to redress. By its plain language, a debt will go beyond one owed or due and go into default when a statute, contract, or other relevant circumstance bearing on the debt's legal or asserted status says it does. Default means the failure to perform a legal or contractual duty, particularly the failure to pay a debt when due. Congress blazed a clear trail—the court need only follow the torchbearing language faithfully.

*Id.* at *9. Fully persuaded that the opinion provides the most cogent and comprehensive analysis of the topic to date, and, indeed, analyzes the issue with reference to this same defendant, this court will adopt *Wagoner*'s approach.

### B.  Whether Ward's Debts Were in Default

Here, the relevant provisions of the Conditions of Admission agreement, particularly when viewed in conjunction with the written policies governing NPAS's efforts and the language of the

billing statements sent to the plaintiff by NPAS, effectively dictate the conclusion that the debts in question were not in default at the time NPAS obtained them—or even at the time it made telephone calls to the plaintiff. The two Conditions of Admission agreements both notified the plaintiff that Stonecrest might, as a courtesy to the plaintiff, bill an insurance company and that the plaintiff would incur financial responsibility for any services that were not covered by insurance. In addition, the agreements state that Stonecrest could "utilize the services of a third party Business Associate or affiliated entity as an extended business office ('EBO Servicer') for medical account billing and servicing." (Doc. Nos. 49-2, at 3; Doc. No. 49-6, at 3.) Finally, the agreements make it clear that, "[d]uring the time that the medical account is being serviced by the EBO Servicer, the account shall not be considered delinquent, past due or in default, and shall not be reported to a credit bureau or subject to collection legal proceedings." (Doc. Nos. 49-2, at 3; Doc. No. 49-6, at 3.)) Although not identified by name in the Conditions of Admission agreements, NPAS is the operative EBO Servicer, and it describes itself as such on each of the statements it sent to Ward pertaining to both of her accounts with Stonecrest: "NPAS, Inc. is a company that is managing your account for the healthcare provider." (Doc. Nos. 49-4, 49-5, 49-7, 49-8.)

The course of dealing here makes it clear that, following the provision of medical services, Stonecrest bills a patient's insurance provider. Once it receives the full amount of compensation that will be provided by the plaintiff's insurance carrier, it sends the account to NPAS to recover that portion of the bill not covered by insurance. That is what occurred here. Under the terms of the Conditions of Admission agreements, Stonecrest's expressed intent was that the debt be considered current, rather than "delinquent, past-due or in default," when it was referred to NPAS for servicing and that the debt, even if it remained unpaid beyond the due date stated in the billing statements sent by NPAS, would not be considered "delinquent, past due or in default" until after

NPAS returned the account to Stonecrest. It is relevant here, though certainly not determinative, that NPAS received the two accounts, respectively, eighty and sixty days after services were provided to Ward by Stonecrest. It kept the accounts, in each case, ninety days or less. And Ward received the voicemail messages that are the focus of her claim before the accounts, respectively, were returned to Stonecrest and, thus, before the debts could have been considered to be in default.

The two initial statements for the two separate accounts told Ward that the payments were "due" ("Payment Due By") fifteen days from the statement dates, and then a second billing statement in each case extended that due date by another ten to fifteen days from the original due date. Since the payments did not become "due" until after the initial statements were sent, the billing statements concerned current receivables, not debts that had already fallen into default under the statute by the time NPAS obtained them. Moreover, none of the four statements mentions any debt or a debt "in default"; instead, they speak in terms of the "current balance." The second statement on each of the two accounts states that, if payment in full is not received, the account "may be referred to a debt collector." (*E.g.*, Doc. No. 49-5, at 1.) The statements plainly informed Ward that NPAS is a "company that is managing [her] account for the healthcare provider." (*E.g.*, *id.* at 2.) As *Wagoner* found under virtually identical circumstances, "[t]here was no mystery here what service NPAS was providing. These statements underscore that the debts were 'due' in the future—not then in default, much less in default when NPAS originally obtained them." *Wagoner*, 2020 WL 1987528, at *10.

It is also clear that neither Stonecrest nor NPAS "treated" the debts as in default. *See Bridge*, 681 F.3d at 362 (holding that "the definition of debt collector pursuant to § 1692a(6)(F)(iii) includes any non-originating debt holder that either acquired a debt in default or has treated the debt as if it were in default at the time of acquisition"). In addition to the language of the billing

statements themselves—referring to the outstanding amount due as the "current balance" and describing NPAS's role as that of account manager—and the description in the Conditions of Admission agreement about when a debt would be deemed "delinquent, past due or in default" (Doc. No. 49-2, at 3), there is no evidence that Stonecrest ever charged late fees or interest on the accounts, referred them to a collection agency or to a law firm for legal proceedings, or reported them to a credit bureau. *Accord Wagoner*, 2020 WL 1987528, at *10 (finding that the debts were not "treated" as being in default). The fact that NPAS may have referred to the accounts internally as "debts" is simply immaterial. Here, as in *Wagoner*, "the communications from NPAS were consistent with its role as an extension of [Stonecrest]'s business office, not as a debt collector." *Wagoner*, 2020 WL 1987528, at *10.

A number of other recent district court opinions from a variety of jurisdictions have likewise granted summary judgment to NPAS under virtually identical factual circumstances, on the grounds that NPAS was not acting as a debt collector because the accounts it was servicing for its medical provider clients were not yet in default. *See, e.g.*, *Raya v. NPAS, Inc.*, No. 1:19-CV-750, 2020 WL 3550009 (E.D. Va. Mar. 31, 2020); *Evans v. NPAS, Inc.*, No. 8:18-CV-02139-PX, 2020 WL 998731 (D. Md. Mar. 2, 2020); *Collazo v. NPAS, Inc.*, No. 8:18-cv-2508, slip op. at 11 (M.D. Fla. June 14, 2019) (finding the "summary judgment record . . . overwhelmingly in favor of NPAS") (Doc. No. 47-1 in this court's record). The court finds the rationale in these opinions instructive and likewise concludes that summary judgment in favor of NPAS is warranted.

The plaintiff's arguments to the contrary are unconvincing. First, she argues that debts were past due when NPAS left her voicemail messages and that, as a contractual matter, the Conditions of Admissions agreements treat "past due" accounts identically to delinquent or defaulted accounts and, therefore, that the debts must have been in default by that time. More precisely, she notes that

NPAS sent a statement to her dated October 3, 2018, informing her that it was acting as Stonecrest's agent and that the balance on her account was due on October 18, 2018. However, on October 24, 2018, six days after that due date, NPAS left the plaintiff a voicemail message indicating that it was calling her on behalf of Stonecrest (but without referencing the reason or a debt at all). The plaintiff did not receive notice that the due date on Account No. 511667555 had been extended to November 27, 2018 until she received the second statement, dated November 17, 2018. But even then, she received a second call regarding the same account on December 27, 2018, a month after the expiration of the extended due date. She asserts that "[a]lmost exactly the same sequence of events" occurred with respect to the second of Ward's accounts placed with NPAS—"two due dates, and one call after the account was unambiguously past due." (Doc. No. 51, at 9.)

Obviously recognizing that the FDCPA exempts from the definition of "debt collector" an entity taking action on a debt that was not in default at the time it was *obtained*, the plaintiff makes the bafflingly convoluted argument that

> it might seem plausible to argue that NPAS obtained the accounts in question as an "EBO Servicer," and that the accounts later became "delinquent, past due and defaulted" while in NPAS's possession, such that NPAS became a "collection agency" without ever transferring the accounts back to Stonecrest. Were that the case, NPAS would arguably fall within the protections of § 1692a(6)(F)(iii). But that possibility, too, is foreclosed by the language of the Conditions of Admission agreement, which only provides for a determination that a debt is "delinquent, past due and defaulted" when the account is in the possession of Stonecrest, (SUMF ¶ 4, 29 ("Upon return [of the medical account] to the Provider . . . the Provider may determine the account to be delinquent, past due and in default.").)

(Doc. No. 51, at 9–10.)

The plaintiff is erecting paper castles and storming them with paper horses. As set forth above, even though Ward failed to pay her account while NPAS was handling it, pursuant to the Conditions of Admission agreement, Stonecrest would not deem or treat the account as "delinquent, past due or in default" until NPAS's efforts to obtain payment had been unsuccessful

and it returned the account to Stonecrest. Ward's accounts clearly were not in default—or past due or delinquent—when NPAS obtained them, and NPAS was still working the accounts when it made the telephone calls. *See* 15 U.S.C. § 1692a(6)(F)(iii) (excluding from the definition of debt collector "any person collecting or attempting to collect any debt . . . which was not in default *at the time it was obtained by such person*"). Thus, the fact that the due dates set forth in the billing statements had expired at the time of the phone calls did not serve in this case to convert NPAS into a debt collector.[4]

Equally bafflingly, the plaintiff asserts that there is "no evidence of record that NPAS, Inc. was operating as an 'EBO Servicer' as defined in the Conditions of Admission agreements when it left any of the three voicemails." (Doc. No. 51, at 9.) Again, this argument ignores the undisputed fact that NPAS had already identified itself in the billing statements as "the company managing [the plaintiff's] account for [Stonecrest]" (*see, e.g.*, Doc. No. 49-4, at 2), which was not dissimilar from the definition of "EBO Servicer" provided in the Conditions of Admission agreements: "a third party Business Associate or affiliated entity [utilized] as an extended business office . . . for medical account billing and servicing" (*e.g.*, Doc. No. 49-2, at 3). In addition, it ignores the plaintiff's consent, in the Conditions of Admission agreement, to "telephone calls for financial communications" from Stonecrest as well as any EBO Servicer. Further, although the plaintiff also consented to telephone calls from the medical provider's "collection agents," it is undisputed that NPAS returned Account No. 511667555 to Stonecrest on or around January 1, 2019,

---

[4] The court acknowledges that this conclusion might be different if the facts of the case were significantly different. If, for example, NPAS had continued to make telephone calls for an extended period of time after the expiration of the due dates, an argument might be made that it was "treating" the debts as defaulted. In this case, however, it is undisputed that NPAS made two calls on the first account and one on the second before returning the accounts to Stonecrest and taking no further action, so the court is not called upon to make that determination.

approximately a week after the second telephone call, and it returned Account No. 511917962 to Stonecrest on or around March 22, 2019, approximately a week after the single voicemail message left in connection with that account. The Conditions of Admission agreements state that, only once the EBO Servicer returned the account to Stonecrest would Stonecrest have the option of determining the account to be delinquent, past due or in default. (*E.g.*, Dc. No. 49-2, at 3.) And again, there are simply no other indicia in the record suggesting that NPAS or Stonecrest, up until that time, had treated either debt as delinquent or in default.

The plaintiff insists that, even assuming that NPAS was acting as an EBO Servicer, the terms of the Conditions of Admission agreement were "designed to evade the FDCPA's strictures" and that a creditor's "unilateral definition of default can be considered only if it is reasonable, consistently applied, and designed 'for administering accounts rather than for circumventing the FDCPA.'" (Doc. No. 51, at 11 (quoting *Prince v. NCO Fin. Servs.*, 346 F. Supp. 2d 744, 747–48 (E.D. Pa. 2004)).) She argues that the "unfettered discretion" granted to Stonecrest by the Conditions of Admission agreement to determine when a debt was in default shows that the purpose of the arrangement between Stonecrest and NPAS is to evade the requirements of the FDCPA.

This argument is unavailing as well. While the Conditions of Admission agreement does give largely unfettered discretion to Stonecrest to determine whether to treat a debt as in default, that discretion, under the clear terms of the agreement, does not come into play until *after* the EBO Servicer's efforts to recover on *current* balances are unsuccessful and the account is returned to Stonecrest. Nothing about Stonecrest's use of NPAS as an EBO Servicer in this particular case

seems designed inherently to avoid the strictures of the FDCPA. Moreover, the cases cited by the plaintiff are either inapposite[5] or unhelpful to her position.[6]

The court finds the plaintiff's other arguments to be against the clear weight of authority. The defendant is entitled to summary judgment in its favor.

## V.    CONCLUSION

For the reasons forth herein, the court will grant the defendant's Motion for Summary Judgment and dismiss this case in its entirety. All other pending motions will be denied as moot.

---

[5] *See, e.g.*, *Young v. NPAS, Inc.*, 361 F. Supp. 3d 1171, 1192 (D. Utah 2019) (holding that the question of default must be determined on a case-by-case basis and finding that one of the plaintiff's six accounts on which NPAS attempted to collect was already in default when referred to NPAS by its hospital client, where it was undisputed that that account had previously been placed with Medicredit, a debt collector; Medicredit had made six phone calls to the plaintiff before her account was withdrawn from Medicredit; and the account was placed with NPAS two hundred and eighty days after the hospital had rendered services to the plaintiff); *Mavris v. RSI Enters. Inc.*, 86 F. Supp. 3d 1079, 1084–90 (D. Ariz. 2015) (in the absence of an underlying contract or applicable law governing the question, applying a multi-factorial balancing test to determine whether a particular debt was in default when obtained by the defendant); *Magee v. AllianceOne Ltd.*, 487 F. Supp. 2d 1024, 1026–28 (S.D. Ind. 2007) (finding that the subject debt was in default—based on the dictionary definition of the term—and, therefore, that the defendant was a debt collector, where it was undisputed that the defendant identified itself as a "debt collector" on the demand letter sent to the plaintiff, the stated purpose of the letter was to "attempt to collect a debt and any information obtained will be used for that purpose," the written agreement underlying the debt defined default as "fail[ure] to pay in a timely manner any amounts due under this Agreement," and it was undisputed that the plaintiff had made no payments on the debt for over three months prior to receipt of the demand letter).

[6] *See, e.g.*, *Evans*, 2020 WL 998731, at *5 ("When viewing the record evidence most favorably to Evans, no reasonable trier of fact could conclude that at the time NPAS assumed collection efforts, the debt was in default under any of the operative theories."); *Roberts v. NRA Grp., LLC*, No. CIV.A. 3:11-2029, 2012 WL 3288076, at *1 (M.D. Pa. Aug. 10, 2012) (granting summary judgment to the defendant where "Defendant obtained Plaintiff's account when it was not in default"); *Prince v. NCO Fin. Servs.*, 346 F. Supp. 2d 744, 748 (E.D. Pa. 2004) (granting summary judgment to the defendant based on the definition of default contained in the creditor's standard customer agreement, despite language ("may") granting the creditor discretion in whether to consider an account in default).

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge